**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 1:18-CV-1490

ALLISON PARKER, individually and as surviving spouse and personal representative of THE ESTATE OF JAMES ABROMITIS

    Plaintiffs

v.

ASPEN WHITEWATER RAFTING, LLC, a Colorado limited liability company

    Defendant

___

**COMPLAINT AND JURY DEMAND**
___

Plaintiffs Allison Parker, individually and as surviving spouse and personal representative of the Estate of James Abromitis, by and through their undersigned counsel, hereby assert the following Complaint stating as follows:

## I. INTRODUCTION

1.    This Complaint arises out of a fatal commercial rafting trip in Aspen, Colorado on a section of the Roaring Fork River called "Slaughterhouse." On June 15, 2016, Plaintiff Allison Parker and her deceased husband James Abromitis signed up to go on a whitewater rafting trip with defendant Aspen Whitewater Rafting, LLC ("Aspen Whitewater"). As set forth herein, Aspen Whitewater knowingly misrepresented and concealed the nature and danger of Slaughterhouse at high water and, once on the river, then engaged in grossly negligent and intentionally reckless conduct causing James Abromitis to be twice ejected in immediate succession from the raft, resulting with him being flushed downriver to his death.

## II.  THE PARTIES

2. Plaintiff Allison Parker is a resident of Maryland and is the widow of James Abromitis.

3. Plaintiff Allison Parker is the Executor of the Estate of James Abromitis, which estate also has Maryland residency.

4. Aspen Whitewater Rafting, LLC is a Colorado limited liability company in good standing formed on January 14, 2004 with a principal business address of 520 East Durant Avenue, Aspen, Colorado 81611.

## III.  JURISDICTION AND VENUE

5. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, as their complete diversity of citizenship.  Plaintiffs' claims exceed the jurisdictional threshold of $75,000.00.

6. The Court has personal jurisdiction over Aspen Whitewater as its principal office is located in Colorado and venue is proper pursuant to 28 U.S.C. §1391.

## IV.  GENERAL ALLEGATIONS

7. During the week of June 15, 2016, Allison Parker and her husband James Abromitis (collectively referred to herein as the "Abromitis') were visiting Aspen during the popular Food & Wine Classic event.

8. While on their Aspen vacation, they became interested in taking a rafting trip.  The hotel concierge suggested Aspen Whitewater and printed a copy of its website for them to review.

9. The Abromitis' reviewed the materials published by Aspen Whitewater and were interested in the Slaughterhouse section of the Roaring Fork River due to its proximity to Aspen and its seeming suitability for their interests.

**Aspen Whitewater's False Advertising**

10. Aspen Whitewater's website advertises that Slaughterhouse is suitable for "a gung-ho beginner" and assures the public that experience is "not required" for this section of river.

11. Aspen Whitewater's public advertising is false and deceptive. The true nature and character of Slaughterhouse is far more advanced.

12. One of the leading guidebooks on Colorado rivers and creeks cautions that Slaughterhouse is only for "expert" rafters.

13. Aspen Whitewater's primary competitor advertises Slaughterhouse as "EXTREME – Advanced….Technical paddling and physical ability are a must – experienced rafters only!"

14. Upon information and belief, Aspen Whitewater intentionally downplays the risks of Slaughterhouse in order to induce a broader and larger base of potential customers to go rafting with them.

15. At normal flows (generally considered from 400 to 1500 cubic feet per second), Slaughterhouse is regarded as a continuous Class IV river.

16. The International Scale of River Difficulty describes a Class IV rapid as: "Intense, powerful but predictable rapids requiring precise boat handling in turbulent water. Depending on the character of the river, it may feature large, unavoidable waves and holes or constricted passages demanding fast maneuvers under pressure…Risk of injury to swimmers is moderate to high, and water conditions may make self-rescue difficult. Group assistance for rescue is often essential but requires practiced skills."

17. The Safety Code of American Whitewater (the "AW Safety Code") distinguishes a Class IV rapid from a Class IV river, cautioning "There is a difference between running an

occasional class-IV rapid and dealing with an entire river of this category." This is because "As rapids become longer and more continuous, the challenge increases" and "the danger to swimming paddlers becomes more severe."

### Undisclosed Risks of High Water Levels on Slaughterhouse

18. Not only were the Abromitis' deceived by Aspen Whitewater's portrayal of Slaughterhouse as suitable for "gung ho beginners," Aspen Whitewater further deceived them by failing to advise them that Slaughterhouse was not running at normal flows, as it was at very high water flow levels at that time.

19. The character of Slaughterhouse changes dramatically when water levels are high. Large and dangerous hydraulics form and certain rapids become long, continuous, and begin to flow one into the next. The risk of "flush drownings" becomes significant.

20. River guidebooks rate Slaughterhouse as Class IV+ to Class V- at higher flows.

21. Class V rapids are described as "Extremely long, obstructed, or very violent rapids which expose a paddler to added risk. Drops may contain large, unavoidable waves and holes or steep, congested chutes with complex, demanding routes. Rapids may continue for long distances between pools, demanding a high level of fitness. What eddies exist may be small, turbulent, or difficult to reach….Swims are dangerous, and rescue is often difficult even for experts…extensive experience, and practiced rescue skills are essential…"

22. Aspen Whitewater knew that on June 15, 2016, Slaughterhouse and other rivers in Pitkin County were running abnormally high due to late season snow, snow melt run, and runoff. But Aspen Whitewater did not warn the Abromitis' of this fact before putting them in a raft or explain the even greater difficulty of the run at this higher water level.

24.     Compounding what were already high water levels in the 2016 summer season, additional water was re-introduced into Slaughterhouse one day before the fatal rafting trip. On June 14, 2016, the Twin Lakes Reservoir and Canal Co. curtailed its standard water diversions from Independence Pass due to excessive water. Instead of pumping water out of the Roaring Fork River and under the Continental Divide to Twin Lakes Reservoir, an additional 600 cfs of native flow was gradually reintroduced back into the Roaring Fork River.

25.     Slaughterhouse was running at over 2,000 cfs the night before Aspen Whitewater launched down the river on June 15, 2016.

26.     Upon information and belief, 2000 cfs is a common limit for other commercial rafting outfitters due to the extreme risk presented by this section of river at high water.

27.     The AW Safety Code warns that high water, cold water, strainers and hydraulics "are the most frequent killers" which "are not always easily recognized." For this reason, the public must be able to rely upon and trust rafting outfitters to recognize these risks, advise and warn customers of these risks, and to implement appropriate policies and measure to mitigate the risk. As detailed below, Aspen Whitewater ignored all four of these "frequent killers" which all then played a combined role in the death of James Abromitis.

28.     The Safety Code explains that with high water, "The river's speed and power increase tremendously as the flow increases, raising the difficulty of most rapids. Rescue becomes progressively harder as the water rises, adding to the danger. Floating debris and strainers make even an easy rapid quite hazardous. It is often misleading to judge the river level at the put in, since a small rise in a wide, shallow place will be multiplied many times where the river narrows."

29.     The river is wide, shallow and calm at the put in at Stein Park where Aspen Whitewater commenced its trip. The Abromitis', in looking at the river where they were to start,

5

had no reason to know how extreme the river was that day. They had no idea how high it was or that they should anticipate the violent and continuous nature of Slaughterhouse further downstream.

30. Aspen Whitewater, in contrast, was fully aware of the significantly increased risk posed by the high river level but failed to inform participants and further failed to take reasonably prudent measures to mitigate against the risks created by high river levels. They did not screen participants for rafting experience; they did not even require rafting experience; and they failed to employ proper safety measures once on the river.

31. The raft trip soon turned into an unmitigated disaster.

**The Series of Avoidable Events Leading to Mr. Abromitis' Death**

32. As the raft approached "James Bond" rapid, the raft guide instructed the customers to paddle towards, and then into, a hydraulic at the top of the rapid. The guide's decision initiated a deadly and foreseeable chain of events.

33. The AW Safety Guide describes a hydraulic (or "hole") occurring "When water drops over an obstacle, it curls back on itself, forming a strong upstream current which may be capable of holding a boat or swimmer. Some holes make for excellent sport. Others are proven killers. Paddlers who cannot recognize the difference should avoid all but the smallest holes."

34. It is not uncommon in appropriate areas of some rivers for raft guides to purposefully paddle into a small hydraulic at the bottom of a rapid for a fun "surf" or "hole ride" if it is just above a large pool of calm flat water, such that it is of little to no consequence if the raft flips or a customer falls out.

35. In stark contrast, the raft guide here acted in conscious and reckless disregard for the life and safety of the customers on the raft by purposefully paddling into a large hydraulic for

a "hole ride" at the top of a long rapid, at a high river level, with frigid water, with no safety set up, and with no way or place to rescue anyone who might fall out. The actions of the raft guide put customers, including James Abromitis, at a real and imminent risk of a flush drowning.

36.     This was not a small hole that the guide paddled the raft and his customers into. It was large enough to hold and recirculate a 14-foot raft carrying 6 grown adults. As they tried in vain to paddle out of the hole, James Abromitis was ejected from the raft into the river where his body was also recirculated in the hole, underneath the raft, until he eventually flushed out downstream and was washed through the entire length of the rapid.

37.     The raft, meanwhile, remained stuck in the hydraulic and provided no assistance to Mr. Abromitis as he was flushed through the rapid. The safety kayaker, likewise, was not positioned anywhere near the raft and provided no assistance to Mr. Abromitis as he was flushed through the rapid. Because Aspen Whitewater chose to run the trip with only one raft, and without the safety of additional rafts to provide support to each other in high water conditions, James Abromitis was on his own.

38.     After being flushed several hundred feet at least through a frigid and violent rapid, he washed into a small swirling eddy immediately upstream from the very next rapid.

39.     The raft, meanwhile, finally extricated itself from the hole upstream of the rapid and paddled down to where Mr. Abromitis was still floating in the river, unaided by anyone with Aspen Whitewater.

40.     Video taken by a reporter on the raft shows him to be in shock, hypothermic, and in a state of acute distress. The AW Safety Guide warns that cold water is "frequent killer" and that "Cold-water immersion, because of the initial shock and the rapid heat loss which follows, is especially dangerous" and that a person will need assistance after prolonged exposure.

41. Inexplicably, the raft guide jumped out of the raft and made no effort to rescue Mr. Abromitis once they reached him. Instead, the guide "abandoned ship" and left the rescue efforts to two customers who attempted to pull Mr. Abromitis into the raft. But, because they were not experienced rafters, they did not know how to pull him into the raft. Video of the incident shows them struggling to pull him in using incorrect and ineffective technique. By the time the two customers eventually pulled Mr. Abromitis back into the raft, the raft had already washed into the next "frequent killer" – a large tree, or strainer, that had fallen into the river, creating an impassible and extremely dangerous obstruction that the raft then broached upon and capsized.

42. The AW Safety Guide warns that strainers are "Brush, fallen trees, bridge pilings, undercut rocks or anything else which allows river current to sweep through can pin boats and boaters against the obstacle. Water pressure on anything trapped this way can be overwhelming. Rescue is often extremely difficult."

43. As the raft floated towards the tree, the raft guide climbed back into the raft in a belated effort to paddle away from this known and obvious danger, but it was too late. The raft immediately broached and the upstream tube of the raft submerged, turning the raft vertical on its side with rushing water pining the raft up against the tree. The raft guide managed to save himself by climbing up onto the tree, but did not help anyone else. His customers were all thrown into the river, including James Abromitis who had been in the raft less than 10 seconds before being thrown back into the river again.

44. Mr. Abromitis was flushed down river through the next rapid while the raft guide stood on the tree watching him disappear. James Abromitis died minutes later from drowning and cardiac arrest, with high water and cold water identified as contributing factors.

**Circumstances Surrounding the Recreational Waiver**

45. The Abromitis' were given and signed a recreational activity Waiver on the Aspen Whitewater shuttle bus ride to the river. However, that waiver did not contain any information about the high water levels of the Roaring Fork River that day, the whitewater classification of the rapids they would attempt to negotiate, the level of rafting skill they should be expected to possess, or the abnormal and extreme dangers of the Slaughterhouse section of the Roaring Fork River at peak run-off conditions.

46. Upon information and belief, the Waiver provided to the Abromitis' is the same form Aspen Whitewater provides to all of its customers, regardless of whether it is a flat water, lazy float trip or an advanced whitewater trip. Nothing in the Waiver informed the Abromitis' that they were about to embark on an advanced high water run requiring a skill-set far more advanced than the "gung ho beginner" description Aspen Whitewater offers the public on its website advertising the trip.

47. At no time did Aspen Whitewater ever inform or explain to the Abromitis' that the Slaughterhouse section of the Roaring Fork River was high and running at or near peak run-off conditions, thereby greatly increasing the risks beyond those normally encountered at lower flows.

48. The Abromitis' were misled and never informed by Aspen Whitewater that Slaughterhouse that day was at a high and dangerous level with continuous class IV+ rapids and Class V- consequences. The Abromitis' did not and could not provide informed consent and waive liability when Aspen Whitewater purposefully whitewashed the real risks presented by the river on that day.

49. The waiver was obtained through Aspen Whitewater's false advertising and knowing concealment of the true river conditions and difficulty, and is therefore void.

50.     Had the Abromitis' known how high the river was running, understood that the level of difficulty increased on an order of magnitude due to the high water, and been informed that a high water run on Slaughterhouse is not safe or suitable for "gung ho beginners" but rather only for experienced rafters, they would not have signed the waiver or participated on the trip and James Abromitis would be alive today.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Wrongful Death)

51.     All of the preceding paragraphs are specifically incorporated within this claim for relief as if fully restated herein.

52.     Aspen Whitewater are required by law to operate its rafts and conduct its rafting trips, in all manners, in a prudent manner with specific regard to the river conditions.

53.     James Abromitis would not have died but for the wrongful acts and omissions of Aspen Whitewater, as detailed with specificity herein.

54.     As the direct and proximate result of the acts and omissions of Aspen Whitewater, James Abromitis suffered a tragic, prolonged, and avoidable wrongful death.

55.     As the direct and proximate result of Aspen Whitewater's acts and omissions, Allison Parker suffered the wrongful death of her husband, including attendant grief, sorrow and the loss of his consortium and companionship.

56.     As the direct and proximate result of Aspen Whitewater's acts and omissions, the Estate of James Abromitis suffered the wrongful death of James Abromitis and its attendant loss of earnings expected throughout the remaining employment of James Abromitis, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
(Gross Negligence)

57. All of the preceding paragraphs are specifically incorporated within this claim for relief as if fully restated herein.

58. Aspen Whitewater owes a statutory and common law duty to its customers, including Plaintiffs, to conduct its rafting operations in a reasonably prudent manner.

59. Aspen Whitewater breached those duties to Plaintiffs by failing to conduct its rafting operations in a reasonably prudent manner.

60. Aspen Whitewater's conduct was attended by willful, wanton, conscious and reckless disregard for the life and safety of its customers.

61. As a direct and proximate cause of Aspen Whitewater's willful and wanton conduct, Plaintiffs have suffered injuries, damages and losses in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
(Colorado Consumer Protection Act, C.R.S. § 6-1-101)

62. All of the preceding paragraphs are specifically incorporated within this claim for relief as if fully restated herein.

63. Aspen Whitewater made, caused to be made, or ratified misrepresentations and nondisclosures of material facts described elsewhere in this Complaint and otherwise made misleading statements that induced the Plaintiffs to act or refrain from acting.

64. Aspen Whitewater made these representations and nondisclosures knowing them to be untrue or recklessly and willfully making them without regard to the consequence, intending that its misrepresentations and nondisclosures would have the capacity or tendency to deceive Plaintiffs and the public.

65. Aspen Whitewater made these misrepresentations and nondisclosures of material fact reasonably expecting that the Plaintiffs would act in reliance upon them.

66. Plaintiffs reasonably relied upon these misrepresentations and/or nondisclosures to their detriment.

67. These representations and/or concealments constitute violations of the CCPA, which prohibits Aspen Whitewater, in the course of its business, from doing any of the following, among other things:

  a.  Knowingly makes a false representation as to the characteristics of services (C.R.S. § 6-1-105(e))

  b.  Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods or services other than those advertised (C.R.S. § 6-1-105(n))

  c.  Fails to disclose material information concerning goods, services which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction; (C.R.S. § 6-1-105(u))

68. Defendant is liable to the Plaintiffs under the CCPA because:

  a.  they engaged in an deceptive trade practice with false advertising as defined by the CCPA

  b.  the challenged practices occurred in the course of the defendant's business, vocation or occupation

  c.  the challenged practices significantly impact the public as actual or potential customers of Defendant's services.

    d. Plaintiffs were directly affected by the challenged practices, and lack the same level of sophistication, experience and knowledge as defendant.

69. Aspen Whitewater made these misrepresentations and nondisclosures in bad faith, by fraudulently, willfully, knowingly and intentionally misleading Plaintiffs and causing injury to Plaintiffs.

70. Aspen Whitewater's failure to disclose material information which necessarily impacts the safety and welfare of its customers constitutes a deceptive and prohibit trade practice under the Colorado Consumer Protection Act.

71. As a direct and proximate result of Aspen Whitewater's deceptive trade practices, Plaintiffs have been harmed in an amount to be proven at trial.

72. Plaintiffs hereby demand as additional damages three times the amount of its actual damages, plus costs expenses and attorney fees, pursuant to C.R.S. § 6-1-113.

### FOURTH CLAIM FOR RELIEF
(Fraud/Misrepresentation)

73. All of the preceding paragraphs are specifically incorporated within this claim for relief as if fully restated herein.

74. Aspen Whitewater made false statements, omissions and concealments of material fact, as set forth with specificity herein.

75. Aspen Whitewater intended that the Abromitis' rely on the false statements and concealments.

76. The Abromitis' in fact reasonably relied on Aspen Whitewater's false statements and concealments.

69. Aspen Whitewater's conduct constitutes fraud and/or misrepresentation.

70. As a direct and proximate result of Aspen Whitewater's fraud and/or misrepresentation, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor, and against Defendant, in an amount to proven at trial, together with pre and post judgment interest thereon, treble damages as provided by C.R.S. §6-1-113 *et. seq*, and for an award of Plaintiffs' reasonable costs, expenses and attorney fees.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated:  June 14, 2018.

Respectfully Submitted:

Feldman & Wertz, LLP

S/ Alan Feldman

By: _____

Alan Feldman, #31737
*Attorneys for Plaintiffs*
215 S. Monarch Street, Suite 303
Aspen, CO 81611
(970)-925-1025